**AVENTIS PHARMA S.A. and Aventis Pharmaceuticals Inc., Plaintiffs,**

v.

**AMPHASTAR PHARMACEUTICALS, INC. and Teva Pharmaceuticals USA, Inc., Defendants.**

No. EDCV03–887 RT(SGLX), EDCV04–333RT (SGLX).

United States District Court, C.D. California, Eastern Division.

June 15, 2005.

Allen M. Sokal, Donald R. Dunner, Esther H. Lim, Geoffrey C. Mason, Michael J. McCabe, II, Finnegan Henderson Farabow Garrett & Dunner, Washington, DC, Anthony G. Brazil, Donald L. Ridge, Megan S. Wynne, Morris Polich & Purdy, Los Angeles, CA, John D. Livingston, Finnegan Henderson Farabow Garrett & Dunner LLP, Atlanta, GA, Richard J. Smith, Finnegan Henderson Farabow Garrett & Dunner, Palo Alto, CA, for Plaintiffs.

Jan P. Weir, Jennifer A. Trusso, Nicole A. Varner, Steven M. Hanle, Stradling Yocca Carlson & Rauth, Newport Beach, CA, Edith Ramirez, Eugene T. Chen, Lee J. Papageorge, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, Francis C. Lynch, John T. Bennett, Kenneth W. Salinger, Laurie S. Gill, Palmer & Dodge, Boston, MA, for Defendants.

ORDER (1) GRANTING DEFENDANT AMPHASTAR PHARMACEUTICALS, INC.'S MOTION FOR SUMMARY JUDGMENT FOR INEQUITABLE CONDUCT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULE 56; (2) DENYING AS MOOT DEFENDANT AMPHASTAR PHARMACEUTICALS, INC.'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY BASED ON INDEFINITENESS; AND (3) DENYING AS MOOT DEFENDANT AMPHASTAR PHARMACEUTICALS, INC.'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY BASED ON 35 U.S.C. § 102.

TIMLIN, District Judge.

The court, Judge Robert J. Timlin, has read and considered defendant Amphastar Pharmaceuticals, Inc. ("Amphastar")'s motion for summary judgment for inequitable conduct pursuant to Federal Rules of Civil Procedure, Rule 56 ("Rule 56"), plaintiffs Aventis Pharma S.A. and Aventis Pharmaceuticals Inc. (collectively, "Aventis")' opposition, and Amphastar's reply. Based on such consideration, the court concludes as follows:

## I.

### BACKGROUND

Aventis is a pharmaceutical company that manufactures Lovenox. Lovenox is a blood thinner that inhibits the formation of certain venous blood clots called thromboses. Lovenox is derived from heparin. Heparin is a mixture of long polysaccharide molecules obtained from the internal organs of animals such as pigs and cattle. Through a chemical process, heparin's longer molecules can be broken down into shorter molecules. A group of these shorter molecules are called low molecular weight heparins ("LMWHs"). U.S. Patent No. 5,389,618 ("the '618 patent") covers a range of defined LMWHs, including Lovenox, and their administration to patients who are susceptible to blood clots.

Aventis filed an action in this court against Amphastar and Teva Pharmaceuticals USA, Inc. ("Teva") (collectively, "Defendants") for infringement of the '618 patent. Defendants dispute infringement and claim that the '618 patent is invalid and unenforceable. One of Amphastar's grounds for unenforceability is the affirmative defense and counterclaim of inequitable conduct by Aventis.

Amphastar now moves the court for summary judgment on its affirmative defense and counterclaim that the '618 patent

is unenforceable due to Aventis' inequitable conduct.

## II.

### UNCONTROVERTED MATERIAL FACTS

The following are uncontroverted material facts supported by admissible evidence:

On May 8, 1981, Aventis filed European Patent Application No. 81/400728.2 ("European Patent Application") based upon French Patent Application No. 80/10791 ("French '791 application"). The European Patent Application was subsequently published on November 18, 1981 as European Patent 40,144.[1]

On June 26, 1990, Aventis filed French Patent Application No. 90/8013 ("French '013 application"), the priority application of the '618 patent. The French '013 application lists the sole inventor as Roger Debrie ("Debrie").

In early 1991, Aventis had begun the process of obtaining drug approval for "Lovenox" in the United States. Aventis had no patent protection for Lovenox in the United States at that time.

In a January 1991 internal memorandum, Aventis acknowledges the lack of and need for patent protection in the United States and notes an April 1991 target deadline for filing its New Drug Application ("NDA").

On June 17, 1991, a month before filing its NDA, in another Aventis' internal memorandum discussing Mardiguian 40,-144, Aventis states: "Enoxaparin is not expressly described in this application but is comprised in the claims." The memorandum then notes that the Mardiguian 40,144 patent was revoked and goes on to state, "A patent application concerning the molecular distribution of enoxaparin has been filed on June 26, 1990 in France and must be filed in different countries before June 26, 1991."

On June 26, 1991, Aventis filed United States Patent Application Serial No. 721,-315 ("the '315 application") to the United States Patent and Trademark Office ("PTO"), claiming a priority date of June 26, 1990 based upon the French '013 application. Undisputed footnote 5: On July 16, 1993, Aventis filed a continuation of the '315 application, United States application No. 92,577, which ultimately issued as the '618 patent, the patent in suit.[2]

In July 1991, shortly after filing the patent application, Aventis filed its NDA for Lovenox.

In its 1991 NDA submissions, Aventis claimed that the '315 application covered Lovenox.

In 1992, Aventis represented to the PTO that the invention claimed in the '315 application was patentably distinct from Mardiguian 40,144 (which was the same as the French '611 patent).

Aventis distinguished the compositions of Mardiguian 40,144 in the '618 patent's written description.

The '315 application was filed with 28 original claims with original Claim 1 being the only independent claim.

In an Office Action dated April 2, 1992, the PTO rejected all the original claims for various reasons and in particular rejected Claims 1–7 and 24–28 for being anticipated or obvious over several references, including Mardiguian 40,144.

---

1. This order will refer to European Patent 40,144 as "Mardiguian 40,144." Mardiguian was the inventor of European Patent 40,144.

2. The '315 application issued as the '618 patent.

On August 3, 1992, Aventis responded to the Office Action by arguing that the prior art did not render the claims unpatentable.

On October 16, 1992, the PTO issued another Office Action rejecting all the pending claims including rejecting Claims 1–7, 24–28, and 29–31 as both anticipated and obvious in view of the prior art including Mardiguian 40,144.

On April 16, 1993, Aventis filed an "Amendment After Final Rejection" responding to the PTO's rejections. In its response, Aventis refers to arguments that were discussed during the interview with the PTO examiner on March 2, 1993.

In support of its April 1993 arguments, Aventis submitted an expert declaration of its employee, Dr. Andre Uzan ("Dr. Uzan") ("First Uzan Declaration"), which specifically addressed the Examiner's statement that the half-life data reported in Example 6 of the '315 application was not significant.

The First Uzan Declaration also includes an analysis of a purported reproduction of Example 8 of Mardiguian 40,-144, finding 21% of molecules below 200 daltons, 6% greater than 8,000, and 73% between 2,000 and 8,000, which the declaration states "is clearly outside the scope of the present invention."

On July 16, 1993, Aventis filed a continuation application, which ultimately issued into the '618 patent.

On September 9, 1993, Aventis filed a Preliminary Amendment which amended the claims and responded to the Examiner's May 13, 1993 Advisory Action.

On November 20, 1993, the PTO issued another Office Action once again rejecting the pending claims over Mardiguian 40,-144.

On May 16, 1994, Aventis filed another Amendment responding to the Examiner's objections.

After another interview with the Examiner on May 17, 1994, Aventis filed a Supplemental Response dated June 17, 1994 and another Declaration from Dr. Uzan ("Second Uzan Declaration"). This Second Uzan Declaration presented five tables: "Tables, I, X and XI which refer to the compound of the invention and Tables A and III which refer to the compound of Mardiguian."

The Second Uzan Declaration goes on to compare the half-life data in Table X (4.36 hours +/1.07) with the data in Table III (3.33 hours +/.69), and asserts that the difference is statistically significant.

A 1984 Aventis study by Aiach and Fourtillan ("Aiach/Fourtillan Study") is the source of the data in paragraph (3) of Example 6 of the '618 patent (as well as Table III attached to the Second Uzan Declaration filed during the prosecution of the '618 patent).

Aventis acknowledged that paragraph (3) of Example 6 in the '618 patent was "a product prepared according to the process described in European Patent EP 40,144."

In November/December 1985, in connection with Aventis' application for marketing approval in Europe, Aventis prepared a dose-ranging study on PK 10169 [3] by, among others, Frydman/Duchier ("Frydman/Duchier Study"). The Frydman/Duchier dose-ranging study shows a half-life of 4.36 hours +/1.07 for 40 mg dose and 3.70 +/0.82 for 60 mg dose.

The Frydman/Ducheir study is described in Example 6 of the '618 patent, and is the source of the data in paragraph (1) of Example 6 and Tables X and XI in the Second Uzan Declaration. The results

---

3. PK 10169 is a specific LMWH. It is also known as enoxaparin.

of the 1986 Frydman/Duchier Study were published in 1988: Frydman, et al., The Antithrombotic Activity and Pharmacokinetics of Enoxaparine ..., 28 *Journal of Clinical Pharmacology* 609–618 (1988).

The information in the '315 application and the '618 patent regarding the biological properties of the claimed invention and those of prior compounds was provided by Dr. Uzan.

Dr. Uzan testified at his deposition that he recalled the following four sources of the data regarding the biological properties of the claimed invention and those of the prior art compounds: (1) the 1984 Aiach/Fourtillan Study; (2) the 1986 Dawes publication; (3) the 1986 Frydman/Duchier Study (results published in 1988); and (4) a later study referred to in paragraph 4 of Example 6, perhaps attributable to Guibert.

## III.

### *ANALYSIS*

**A. Legal Standard Governing Motion For Summary Judgment**

Under Federal Rules of Civil Procedure, Rule 56(c) ("Rule 56(c)"), a district court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The Supreme Court and the Ninth Circuit have established the following standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issue of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided

in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citations omitted). With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *See id.* at 630–31 (citations omitted).

Rule 56(c) nevertheless requires this court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient: "[T]here must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court thus applies to either party's motion for summary judgment the same standard as that for a motion for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *T.W. Elec. Serv.*, 809 F.2d at 630.

**B. Amphastar's Motion**

**1. Legal Standard for Inequitable Conduct**

█ Amphastar contends the undisputed facts, even with all reasonable inferences in Aventis' favor, establish that Dr. Uzan engaged in inequitable conduct to obtain the '618 patent. Generally, patent

applicants owe a "duty of candor and good faith" to the PTO. 37 C.F.R. § 1.56(a); *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995). "A breach of this duty constitutes inequitable conduct." *Id.* Inequitable conduct can render a patent unenforceable. *See Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1144 (Fed.Cir.2003).

 To render a patent unenforceable, the party asserting inequitable conduct must show (1) affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information; and (2) an intent to deceive the PTO. *See Molins PLC*, 48 F.3d at 1178 (citing *J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985)); *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 2005 U.S. Dist. LEXIS 6545, at *36 (C.D.Cal.2005). Materiality and intent must be established by clear and convincing evidence. *Ulead Sys., Inc.*, 351 F.3d at 1144. The court then weighs materiality and intent "to determine if equity warrants a finding of inequitable conduct." *Id.*

 Inequitable conduct is an equitable doctrine and therefore is not an issue for a jury to decide. *PerSeptive Biosystems, Inc., v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed.Cir.2000). "Although the premises of inequitable conduct require findings based on all the evidence, a procedure that may preclude summary determination, a motion for summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant can not [sic] prevail."

*ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed.Cir.1998).

The issue before the court is whether certain factual representations on behalf of Aventis by Dr. Uzan to the PTO or nondisclosures by him to the PTO concerning the purported improved half-life of the '618 patent over the half-life of Mardiguian 40,-144 constitute inequitable conduct.[4]

## 2. Relevant Prosecution History of the '618 Patent

The Background of the Invention section of the '618 patent states: "The processes described in the prior art, and especially in EP 40,144, do not permit the production of mixtures possessing the requisite pharmacological properties for improved therapeutic applications, namely, a sufficiently long plasma half-life, a fairly high absorption rate, a high bioavailability or alternatively, a low clearance." It also states that "the mixtures of the ['618 patent] exhibit a half-life longer than other known preparations." (emphasis added).

Aventis supported the half-life assertion with Example 6 of the '618 patent ("Example 6"). Example 6 states:

This example illustrates the increase in stability, in vivo, of the mixtures of the invention, expressed by their plasma half-life.

A first pharmacokinetic study was carried out on volunteers between 21 and 30 years of age. Subcutaneous injections of doses ranging from 20 to 80 mg/ml were performed. At intervals of time, samples were drawn (4.5 ml) and stored at approximately 4[deg] C. The samples were then centrifuged for 15 minutes at 2,300 g and the platelet-poor plasma was separated and frozen prior concentration in the blood.

---

4. Half-life is the time over which the concentration of a drug falls to half of its original

to analysis. The half-life of the mixtures was then determined by measuring the anti-Xa activity. The results obtained were as follows:

(1) From the mixtures produced in Examples 3 and 4 [5]: 40 mg dose: in 75% of the cases, the half-life was longer than 4 hours, and was even longer than 4½ hours in approximately 45% of the cases; 60 mg dose: in 75% of the cases, the half-life was longer than 3.7 hours.

(2) Under identical dosage conditions, intact heparin injected intravenously possessed a half-life of approximately 0.6 hours.

(3) When the product was prepared according to the process described in European Patent EP 40,144, the half-life was longer than 4½ hours in 17% of the cases.

(4) A second study carried out under similar conditions on 20 patients provided the following results for the mixtures according to the present invention: 40 mg dose: in 80% of cases, the half-life was longer than 4 hours, and it was longer than 4½ hours in approximately 40% of the cases; 20 mg dose: in 60% of the cases, the half-life was longer than 3.9 hours.

A significant portion of the '618 patent's prosecution history focused on Example 6 and its subject: half-life. In an Office Action date April 2, 1992, the PTO rejected all claims of the '618 patent. The Examiner stated that Aventis must "provide[ ] some unexpected or unobvious property not demonstrated by the prior art products." In response, on August 3, 1992, Aventis referred the Examiner to Example 6 and stated, "[i]n this regard, the Examiner is referred to Example 6 of the originally filed application wherein the product was prepared in accordance with the European patent and found to have a half-life significantly shorter than was observed with the formulation of the present invention ... Here, therefore, it should be apparent that formulations as claimed, having significantly improved half-lives as compared to the formulations of the European patent, are necessarily different from those of the European patent."

The Examiner rejected Aventis' response. He wrote, "[a]pplicant's arguments filed August 3, 1992 ... are not deemed to be persuasive .... Applicants assertions regarding the comparative data in the specification (comparison to EP 40144–Mardiguian) are not convincing ... since the half-life for [the Mardiguian patent] appears to be essentially the same as that for the instant mixtures."

On April 16, 1993, Aventis again responded to the Examiner's rejection. Aventis reiterated its position that the '618 patent was patentable over Mardiguian 40,144. Aventis wrote, "[i]n particular, Example 6 clearly demonstrates that the claimed compounds exhibit improved pharmacokinetic properties and, in particular, the products of the invention were found to have a plasma half-life longer than 4–1/2 hours in 40–45% of the cases where such half-life was observed in accordance with Mardiguian in only 17% of the cases. This represents an increase in 250% in half-life."

In support of the April 16, 1993 response, Aventis submitted the First Uzan Declaration. In addition to reiterating the purported increase in half-life, Dr. Uzan stated, "[t]his represents an increase in 250% in half-life and is very significant because it enables the same effect to be achieved with lower dosages."

5. Examples 3 and 4 illustrate the preparation, properties, and certain structural characteristics of the '618 patent.

On July 16, 1993, Aventis filed a continuation application that ultimately issued as the '618 patent. In the application, Aventis responded to the Examiner's May 19, 1993 Advisory Action. Among other things, Aventis represented, "the data to which applicant presented in the Declaration Pursuant to 37 C.F.R. § 1.132 have a high degree of accuracy."

On November 20, 1993, the Examiner responded. He stated that Aventis "has failed to provide evidence that the alleged difference between the half-life of the Mardiguian product and that of the instant mixture is statistically significant." On May 16, 1994, Aventis responded:

"The results also demonstrate that different half lives were obtained for the claimed preparation versus the closest preparation for Mardiguian. **In particular, the half-live obtained for the claimed preparation was 4.36 +/1.07 hours whereas that for Mardiguian was 3.33 +/0.2 hours. This is approximately a 30% difference in results and is significant in that it means that the claimed preparations can be administered at significantly lower doses.**"

On May 17, 1994, after another interview with the Examiner, Aventis filed a Supplemental Response and the Second Uzan Declaration. The Second Uzan Declaration presented five tables: Tables, I, X, and XI which refer to the '618 patent and Tables A and III which refer to Mardiguian EP 40,144.

Table III "refer[s] to the compound of Mardiguian." Without mentioning dose amount, Table III reflects a mean half-life of 3.33 hours with a standard deviation of 0.82. Table X "refer[s] to the compound of the ['618 patent]." At a dose of 40 mg, it reflects a mean half-life of 4.36 hours with a standard deviation of 1.07. Table XI also "refer[s] to the compound of the ['618 patent]." At a dose of 60 mg, it reflects a mean half-life of 3.70 hours with a standard deviation of 0.82.

### 3. Amphastar's Contentions

Amphastar contends that Dr. Uzan's representations constituted a failure to disclose material information and an affirmative misrepresentation of a material fact. They constituted a failure to disclose material information because the unspecified dose amount in Table III was actually 60 mg and Dr. Uzan repeatedly [6] compared it to a disclosed 40 mg dose of the '618 patent. Comparing the 60 mg dose amount of Mardiguian 40,144 and the 60 mg dose amount of the '618 patent results in a much closer mean half-life.[7] It constituted an affirmative misrepresentation of a material fact because Dr. Uzan's declarations affirmatively stated that the half-life of the '618 patent was improved over Mardiguian EP 40,144 while the data before him did not support such a conclusion.

Amphastar also contends Dr. Uzan should have disclosed to the Examiner additional evidence known to Dr. Uzan. This evidence establishes that had Dr. Uzan compared the same dose amounts, the '618 patent would not have been an improvement over Mardiguian EP 40,144 as to half-life. This evidence consists of the following studies.

The first study is a 1984 comparative study of the bioavailability of two salts of

---

6. The comparisons of the 40 mg dose of the '618 patent to the 40 mg dose of Mardiguian 40,144 were represented in paragraph (3) of Example 6, the May 17, 1994 Supplemental Response, the First Uzan Declaration, and the Second Uzan Declaration.

7. This closer mean half-life is evident by comparing Table III with Table XI. Table III reported the half-life for Mardiguian EP 40,144 at a 60 mg dose as 3.33 hours with a standard deviation of 0.2. Table XI reported the half-life for the '618 patent at a 60 mg dose as 3.70 hours with a standard deviation of 0.82.

enoxaparin by M. Aiach and J.B. Fourtillian ("Aiach/Fourtillian Study").[8] The Aiach/Fourtillian Study included tests on PK 10169. This study is important because it formed the basis of Aventis' May 16, 1994 Amendment responding to the Examiner's objections and the Second Uzan Declaration. Among other things, the Aiach/Fourtillian Study contains the data that formed the basis of Table III, which reported the half-life for Mardiguian 40,144 as 3.33 hours with a standard deviation of 0.2. The Aiach/Fourtillian Study was conducted at a 60 mg dose. This dose was not apparent from Table III, which was submitted with the Second Uzan Declaration.

The second study is Bara, et al., Comparative Pharmacokinetics of a Low Molecular Weight Heparin (PK 10169) . . . , 39 *Thrombosis Research* 631–36 (1985) ("Bara Study"). The Bara Study also conducted tests on PK 10169. Among other things, the Bara Study reported the mean half-life of a 40 mg dose of PK 10169 was 4.6 hours.[9] Dr. Uzan did not cite the Bara Study to the PTO during the prosecution of the '618 patent.

Bara also co-authored a related study with J. Dawes entitled Relationship Between Biological Activity and Concentration of a Low–Molecular–Weight Heparin (PK 10169) and Unfractionated Heparin after Intravenous and Subcutaneous Administration, 15 *Haemostasis* 116–122 (1986) ("Dawes Study"). Like the Bara Study, Dr. Uzan did not cite the Dawes Study to the PTO during the prosecution of the '618 patent. Among other things,

the Dawes Study reported the half-life of a 40 mg dose of PK 10169 was 4.6 hours.[10]

The fourth study is a 1986 comparative study of the linear resorption of 4 doses of enoxaparin (20, 40, 60, and 80 mg) given as a single sub-cutaneous injection to twelve healthy individuals by J. Duchier and A. Frydman ("Duchier/Frydman Study"). The Duchier/Frydman Study compared different doses of the admixture which later became the '618 patent. Among other things, the Duchier/Frydman Study showed a mean half-life of 4.36 hours +/1.07 for a 40 mg dose and 3.70 hours +/.82 for a 60 mg dose. The 40 mg dose data was eventually included in Aventis' May 16, 1994 Amendment responding to the Examiner's objections and in the Second Uzan Declaration.

### 4. Elements of Inequitable Conduct

#### a. Affirmative Misrepresentation of a Material Fact, Failure to Disclose Material Information, or Submission of False Material Information

Inequitable conduct requires affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information. *Molins PLC*, 48 F.3d at 1178. 37 C.F.R. § 1.56 ("Section 1.56") defines factual materiality for which the PTO has promulgated the duty of disclosure. *Bruno Indep. Living Aids v. Acorn Mobility Servs.*, 394 F.3d 1348, 1352 (Fed.Cir.2005) (citing *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed.Cir. 1997)). As defined in the current version of the rule,[11] information is material to

8. This study is different from Aiach, et al., A New Molecular Weight Heparin Derivative, 31 *Thrombosis Research* 611–621 (1983).

9. This was reported in the study as 275 minutes.

10. This was reported in the study as 275 minutes.

11. According to the PTO's notice of final rulemaking, the rule change applied to all applications pending or filed after March 16, 1992. Duty of Disclosure, 57 Fed.Reg.2021 (Jan. 17, 1992). The '618 patent issued February 14, 1995. Therefore, the new rule was applicable during the prosecution of the '618 patent and

patentability when it is not cumulative to information already of record or being made of record in the application, and:

(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

■ As discussed more fully above, through three Office Actions, the PTO rejected Aventis' claims because they were anticipated and obvious in view of Mardiguian EP 40,144. To overcome this bar to patentablility, Aventis repeatedly opposed the "argument of unpatentability relied on by the Office" and asserted an "argument of patentability" based on the purported improved half-life of the '618 patent over Mardiguian EP 40,144. These repeated representations satisfy materiality as defined in Section 1.56.

Aventis did not disclose that it derived the half-life data reported in paragraph (3) of Example 6, the May 17, 1994 Supplemental Response, the First Uzan Declaration, and the Second Uzan Declaration from a comparison of the Mardiguian LMWH at a different dose than the claimed LMWH. Moreover, Aventis did not disclose that a comparison of the same dosages did not yield significantly different half-lives. The Aiach/Fourtillian Study and the Duchier/Frydman Study show that Example 6 of the '618 patent was comparing 60 mg dose data of Mardiguian EP 40,144 to 40 mg dose data of the '618 patent. When Dr. Uzan submitted his two declarations affirmatively representing

that there was a "significant" difference in the half-life between Mardiguian EP 40,-144 and the '618 patent, he was comparing a 60 mg dose of Mardiguian EP 40,144 to a 40 mg dose of the '618 patent. A comparison of Aiach/Fourtillian Study and the Duchier/Frydman Study indicates that a 60 mg dose of the '618 patent had a half-life of 3.70 hours +/.82 and a 60 mg dose of Mardiguian EP 40,144 had a half-life of 3.33 hours +/.69. Thus, Aventis compared different doses to show a difference in half-lives, but a comparison of available data regarding the same dose actually showed that there was little if any difference between the half-lives of Mardiguian EP 40,144 and the '618 patent.

Based on the foregoing, the court concludes that Amphastar, by clear and convincing evidence, has met "its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issue of material fact" with respect to Aventis' failure to disclose material information.[12] See T.W. Elec. Serv., Inc., 809 F.2d at 630. Therefore, the burden of production now shifts to Aventis to establish "specific facts showing that there is a genuine issue for trial." Id.

Aventis opposes Amphastar's motion on four general grounds. First, Aventis contends that the studies and data cited by Amphastar were not Mardiguian EP 40,-144 admixtures. Second, Aventis contends that errors in the half-life data of Example 6 actually favor the prior art. Third, Aventis contends that the Examiner considered the half-life data reported in Example 6 insignificant and relied only on comparison of mean half-lives derived from

the court evaluates the materiality under the standard set forth in the new rule.

**12.** As discussed more fully below, the court notes that in determining whether Amphastar met its initial burden, the court did not consider the Dawes Study and the Bara Study.

the underlying data. Finally, Aventis contends that Dr. Uzan told the Examiner that he was comparing different dosages. The court will consider each of these arguments.[13]

### (i.) Prior Art Studies

As a preliminary matter, the court will first address the prior art studies of Dawes, Bara, Aiach/Fourtillan, and Frydman/Duchier because whether these studies are controverted will affect which evidence the court will consider when addressing the remaining arguments below.

Aventis contends that the LMWH tested in the studies were not Mardiguian EP 40,144 admixtures. Specifically, Aventis claims that Lot 573, the batch that is the subject of the Aiach/Fourtillan study was not an admixture prepared according to Mardiguian EP 40,144. Moreover, Aventis claims that Lot 930, the batch that is the subject of the Dawes Study and Bara Study, was also not prepared according to Mardiguian EP 40,144. Therefore, Aventis asserts that the Dawes and Bara Studies are not Mardiguian EP 40,144 products and the court should not consider the half-lives reported in the Dawes and Bara Studies as reflecting the half-lives of Mardiguian EP 40,144.

The court concludes based on evidence submitted by Aventis that a reasonable jury could find that the Dawes and Bara Studies were not prepared according to Mardiguian EP 40,144. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Due to this controverted fact, the court concludes that whether the omission of the Dawes and Bara Studies constituted a failure to disclose material information is a genuine issue of fact. *See Molins PLC*, 48 F.3d at 1178. The court therefore will not consider the half-lives reported in the Dawes and Bara Studies.

It is uncontroverted that the Aiach/Fourtillan study is the source of the data in paragraph (3) of Example 6 of the '618 patent, as well as Table III attached to the Second Uzan Declaration filed during the prosecution of the '618 patent. Example 6 of the '618 patent specifically states that the data in paragraph (3) relates to Mardiguian 40,144. Moreover, it is uncontroverted that the Frydman/Duchier study is described in Example 6 of the '618 patent, and is the source of the data in paragraph (1) of Example 6 and Tables X and XI in the Second Uzan Declaration.

It is uncontroverted that Aventis represented to the PTO that the Aiach/Fourtillan Study relates to the Mardiguian EP 40,144, and it is further uncontroverted that the Aiach/Fourtillan Study relates to the Mardiguian EP 40,144. The court will also consider the Frydman/Duchier study because it is factually undisputed that it is the source of data represented in the '618 patent. The court will not however, consider the Dawes and Bara studies for any purpose.

### (ii.) Errors in the Half–Life Data of Example 6 Favor the Prior Art and Militate Against Patentability

Aventis contends that errors in the half-life data of Example 6 favor the prior art. Specifically, Aventis contends that Subparagraphs (1), (3) and (4) of Example 6 admittedly contain errors in the reported percentages of patients having the specified half-lives. For example, subparagraph (3) purports to state the percentage of cases having a half-life longer than 4½

---

**13.** The court notes that Aventis also opposes Amphastar's motion on the ground that Dr. Uzan's comparison of half-lives at different dosages was reasonable. The court will address this argument in the intent section below.

hours, which, if reported correctly, would be 0%. However, subparagraph (3) reports 17%, which favors the Mardiguian EP 40,-144 admixture for half life longer than 4½ hours. Therefore, Aventis concludes that while Example 6 has errors, those errors would actually militate against patentability because they erred in Mardiguian EP 40,144's favor.

Aventis' contention fails because it depends on the assumption that an increase in dose yields a longer half-life. Yet, Aventis submits no evidence that in the context of Mardiguian EP 40,144 or the '618 patent, half-life increases with doses between 40 mg and 60 mg. The closest Aventis comes to producing such evidence is Dr. Uzan's statement that "the probability of having higher pharmacological parameters is higher with a higher dose than it is with a lower dose." This general statement does not create a genuine issue of material fact because it is not specific, is unconnected to the Mardiguian patent or LMWHs in general, and is contradicted by other credible evidence. *Univ. of W. Va. v. Van Voorhies*, 278 F.3d 1288, 1299 (Fed.Cir.2002) ("[S]elf-serving, uncorroborated [evidence] do[es] not create a genuine issue of material fact to preclude summary judgment in light of the overwhelming evidence and admissions"). The Frydman/Duchier Study which studied the '618 patent indicates that half-life does not increase with doses between 40 mg and 60 mg. The Frydman/Duchier Study reported half-life by dose as follows:

| Dose | Mean +/Standard Deviation |
| --- | --- |
| 20 mg | 4.18 +/2.21h |
| 40 mg | 4.36 +/1.07h |
| 60 mg | 3.70 +/0.82h |
| 80 mg | 3.46 +/0.86h |

This table shows that the half-life for a 60 mg dose is approximately 0.66 hours less than for a 40 mg dose. Moreover, the half-life for a 60 mg dose of Mardiguian 40,144 is 3.33 hours +/.69, which suggests that Mardiguian 40,144's half-life is not significantly different than the '618 patent. In sum, because Aventis submits no evidence from which a reasonable jury could find that the 60 mg dose favored Mardiguian 40,144, Aventis does not create a genuine issue of material fact that its error, namely omitting the dosage of Mardiguian 40,144, militates against patentability. Based on the evidence before the court, comparing the 60 mg dose of Mardiguian with the 40 mg dose of the '618 patent actually militates in favor of patentability.

### (iii.) Significance of Example 6

Aventis contends that the Examiner considered the half-life data reported in Example 6 insignificant and relied only on comparison of mean half-lives derived from the underlying data. In support of this claim, Aventis cites the Second Uzan Declaration, which abandoned the percentage calculations of the compared half-lives and focused instead on the means of the compared half-lives. Therefore, based on the Second Uzan Declaration, Aventis concludes "the patentee exclusively relied on comparisons of mean half-life data calculated from the entire set of patient data at a given dose for distinguishing the Mardiguian [40,144]."

Aventis' argument that the Examiner "declined to rely on the half-life percentages reported in Example 6 and the comparison by Dr. Uzan in his declaration" is essentially an argument that such prior representations are not material.[14] In the context of inequitable conduct, materiality is defined in Section 1.56. In relevant part, Section 1.56 defines material information as noncumulative information that opposes an argument of unpatentability

---

14. Noteworthy is the lack of evidence to support Aventis' claim of non-reliance by the Examiner. This contention appears grounded in speculation.

relied on by the PTO or asserts an argument of patentability. As discussed above, Example 6 purports to "illustrate[ ] the increase in stability, in vivo, of the mixtures of the invention, expressed by their plasma half-life." This is an argument of patentability. Thus, as defined by Section 1.56, Example 6 is material.

Moreover, the Federal Circuit has made clear that for a misrepresentation to be material, it "need not be relied on by the examiner in deciding to allow the patent. The matter misrepresented need only be within a reasonable examiner's realm of consideration." *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed.Cir.1989). Section 1.56 does not state, and Aventis cites no law suggesting, that evidence which is material under section 1.56 can become immaterial because the patent applicant submitted subsequent non-cumulative information in support of patentability or in opposition to an argument of unpatentability. The fact that Aventis submitted data reflecting the mean half-lives of the LMWHs does not indicate that the Examiner stopped relying on the percentages. Indeed, in an amendment filed by Aventis on June 1, 1994, Aventis called the subsequent data "additional data," which indicates that it was not cumulative. Further, the amendment only reported the same data in a different manner. Finally, even if the Examiner relied only on the reported mean half-lives, this does not render Example 6 irrelevant because Aventis continued to use the same underlying data—a 60 mg Mardiguian EP 40,144 dose and a 40 mg '618 patent dose—to establish the same point, mainly that the '618 patent showed a "substantial" improvement in half-life over Mardiguian EP 40,144.

**(iv.) Dr. Uzan's Disclosures to the Examiner**

Aventis contends that Dr. Uzan disclosed to the PTO that he used different dosages in comparing the half-lives of the Mardiguian and Debrie admixtures. In support of this contention, Aventis submits the First Uzan Declaration and an Amendment filed on June 1, 1994. The First Uzan Declaration states:

"[T]he claimed formulations have also been compared with those set forth in Mardiguian, European Patent 0,040,144. As discussed therein, the claimed formulations had a plasma half life longer than 4½ hours in 45% of the cases in contrast to Mardiguan who achieved such a half life in only 17% of the cases. **This represents an increase in 250% in the half life and is very significant because it enables the same effect to be achieved with lower dosages.**" (emphasis added)

An Amendment filed by Aventis on June 1, 1994, similarly states:

"As for results obtained by applicant, it is noted that the Patent Office is concerned that the evidence provided to date by applicant to distinguish his invention from the applied prior art is not statistically significant. To this end, additional data has been provided setting forth the sampling from which the data relied upon by applicant was obtained. The results also demonstrate that different half-lives were obtained for the claimed preparation versus the closest preparation of Mardiguian. In particular, the half life obtained for the claimed preparation was 4.36 +/1 1.07 hours where as that for Mardiguian was 3.33 +/0.2. **This is approximately a 30% difference in results and is significant in that it means that the claimed preparations can be administered in significantly lower doses.**" (emphasis added).

Aventis also submits the deposition of Dr. Uzan. In the deposition, Dr. Uzan interprets his statement in his first declaration

as "say[ing] the comparison is a comparison between two doses of which one is lower than the other."

With respect to the First Uzan Declaration and the June 1, 1994 Amendment, neither of these statements can reasonably be interpreted as meaning that the half-life data was based upon different dosages. The two documents purportedly compare the '618 patent and Mardiguian EP 40,144 to reveal a "significant" difference in response to a lack of statistical significance from prior art. In other words, the language in these documents means that the comparison between these two admixtures is significant because the results establish that one can be administered at a lower dose than the other. It is not an illustration of application at a lower dose. It is "significant ... because it enables" administration of the LMWH at a lower dose.

Dr. Uzan's statement in his deposition interpreting the First Uzan Declaration is specious and cannot create a genuine issue of material fact. *See Van Voorhies,* 278 F.3d at 1299. It is clear from the documentary evidence that there is no suggestion that the data was obtained from preparations at different doses. Dr. Uzan concedes as much:

> Question: Do you, anywhere in Exhibit 16 [First Uzan Declaration], tell the Examiner that the Mardiguian formulations which you are reciting data for in the second sentence involve a 60 milligram dose?
> Answer: No, my declaration is not specific to that degree.

### b. Intent to Deceive the PTO

■ Inequitable conduct requires intent to deceive the PTO. *See Molins PLC,* 48 F.3d at 1178. If the materiality of a misrepresentation of a material fact is high, then a lesser showing of intent can be sufficient. *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370, 1381

(Fed.Cir.2001). "Intent need not, and rarely can, be proven by direct evidence." *Merck & Co., Inc.,* 873 F.2d at 1422 (Fed. Cir.1989). Rather, in the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information. *See Paragon Podiatry Lab., Inc. v. KLM Labs. Inc.,* 984 F.2d 1182, 1193 (Fed.Cir.1993).

### (i.) High Materiality

■ Aventis' representations regarding half life during prosecution of the '618 patent made the purported significantly improved half-life highly material to patentability. As discussed above, Aventis referred the Examiner to the increased half-life established in Example 6 of the '618 patent in response to a rejection of obviousness. On August 3, 1992, in response to the Examiner's contention that the comparative data in Example 6 was not persuasive, Aventis reiterated its position that '618 was patentable over Mardiguian EP 40,144 because of the purported increase in half-life. The PTO was not persuaded. On April 16, 1993, Aventis submitted evidence purporting to show a 250% increase in half-life. Aventis also submitted the First Uzan Declaration and represented a "very significant" increase in half life. The Examiner again rejected Aventis claims because Aventis "failed to provide evidence that the alleged difference between the half-life of the Mardiguian product and that of the instant mixture is statistically significant." Thereafter, on November 20, 1993, Aventis made the further representation that:

> [D]ifferent half lives were obtained for the claimed preparation versus the closest preparation for Mardiguian. In particular, the half-life obtained for the claimed preparation was 4.36 +/1.07 hours whereas that for Mardiguian was 3.33 +/0.2 hours. This is approximately

a 30% difference in results and is significant in that it means that the claimed preparations can be administered at significantly lower doses.

Aventis' representations satisfied Section 1.56 as to materiality. Aventis referred to the purported improved half-life of the '618 patent on at least four occasions in opposition to "argument[s] of unpatentability relied on by the Office" and asserted an "argument of patentability" based on the improved half-life of the '618 patent over Mardiguian EP 40,144. These repeated representations establish that Aventis created high materiality for half-life. Militating even further in favor of a high materiality is the fact that the Examiner allowed the patent after the last representation purporting to establish a statistically significant improvement in half-life based on the half-live obtained for the '618 patent, which was 4.36 +/1.07 hours, whereas that for Mardiguian EP 40,144 was 3.33 +/0.2 hours.

### (ii.) Credible Explanation

Aventis contends that Dr. Uzan's comparison of half-lives at different dosages was reasonable and it provides a variety of explanations. Essentially relying on a contention above—that errors in the half-life data of Example 6 actually favor the prior art—Dr. Uzan stated in his deposition:

> "So, in this case, I gave preference to Mardiguian product in selecting the dose that I selected which was the higher dose than the Debrie dose. If I had done the opposite, I would have, to some extent, given an advantage to the Debrie admixture, but I did not. On the contrary, I gave advantage to the [Mardiguian patent], so there is nothing abnormal there."

In addition to this alleged advantage, Aventis also argues that it chose to use the 40 mg dose of the '618 patent because the 60 mg dose caused bleeding in post-operative patients. Finally, Aventis argues that the 60 mg dose in the Frydman/Duchier Study was not confirmed while the 40 mg dose was confirmed in a separate study. Based on these three grounds, Aventis asserts that Dr. Uzan's comparison of half-lives at different dosages was reasonable and thus a credible explanation for the omission.

Aventis' contention fails generally because the question is not whether use of the 40 mg dose was reasonable. The issue is whether Dr. Uzan's two declarations, which affirmatively represented that there was a "significant" difference in the half-life between Mardiguian EP 40,144 and the '618 patent by comparing a 60 mg dose of the Mardiguian patent to a 40 mg dose of the '618 patent, was an omission of a material fact, especially in light of the fact that the same study showed the 60 mg dose of the '618 patent established that the half-lives were much closer.

Aventis' specific arguments also fail. As discussed more fully above, other than Dr. Uzan's unsupported and general claim, Aventis submits no evidence that the 60 mg dose gave preference to Mardiguian EP 40,144. Finally, Dr. Uzan's explanations—that he chose to use the 40 mg dose of the '618 patent because the 60 mg dose caused bleeding in post-operative patients and that the 60 mg dose was not verified—are not persuasive because he used the same 60 mg dose in paragraph (1) of Example 6.

### (iii.) Facts and Circumstances Surrounding Failure to Disclose Material Information

The facts and circumstances surrounding the failure to disclose the dose differential militate in favor of Aventis' intent to deceive. By comparing different doses, Aventis represented to the Examiner that

the half-life "obtained for the claimed preparation was 4.36 +/1.07 hours whereas that for Mardiguian was 3.33 +/0.2 hours. This is approximately a 30% difference in results and is significant in that it means that the claimed preparations can be administered at significantly lower doses." Indeed, had the 60 mg dose of Mardiguian been compared to the 60 mg dose of the '618 patent, results would have indicated that the mean half-life for the '618 patent was 3.70 +/0.82 hours and the mean half-life for Mardiguian EP 40,144 was 3.33 +/0.2 hours. Whether the Examiner would have concluded that this difference in half-life would "distinguish [the] invention from the applied prior art" in a statistically significant way is unknown. It is unknown because Aventis deprived the Examiner of this opportunity by repeatedly misrepresenting the evidence. This foregoing fact supports a strong inference of intent by Aventis to deceive the PTO. *See Paragon,* 984 F.2d at 1182.

### c. Weighing Materiality and Intent

The court must weigh materiality and intent "to determine if equity warrants a finding of inequitable conduct." *Ulead Sys., Inc.,* 351 F.3d at 1144. Based on the totality of the circumstances, including Amphastar's weighty uncontroverted evidence establishing materiality and intent to deceive and Aventis' scintilla of evidence in opposition thereto, the court concludes that no genuine issues of material fact exist and Amphastar is entitled, as a matter of law and equity, to summary judgment against Aventis on its affirmative defense and counterclaim based on inequitable conduct. As a result, the '618 patent is unenforceable.[15] *See Ulead Sys., Inc.,* 351 F.3d at 1144.

---

**15.** By reason of having granted Amphastar's motion for summary judgment based on inequitable conduct, the court will deny as moot Amphastar's remaining motions for summary judgment, namely Amphastar's motion for

## IV.

### *DISPOSITION*

ACCORDINGLY, IT IS ORDERED:

(1) Defendant Amphastar Pharmaceuticals, Inc.'s motion for summary judgment based on inequitable conduct is GRANTED;

(2) Defendant Amphastar Pharmaceuticals, Inc.'s motion for summary judgment of invalidity based on indefiniteness is DENIED as moot;

(3) Defendant Amphastar Pharmaceuticals, Inc.'s motion for summary judgment of invalidity pursuant to 35 U.S.C. § 102 is DENIED as moot.

summary judgment of invalidity based on indefiniteness and Amphastar's motion for summary judgment of invalidity based on 35 U.S.C. § 102.